UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| JAMES D. HENDRICK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 4:15-cv-00045-SEB-TAB |
| | ) | |
| SUSAN KNOEBEL, | ) | |
| *et al.* | ) | |
| Defendants. | ) | |

## **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on Defendants' Motion for Summary Judgment [Docket No. 35], filed on September 16, 2016, pursuant to Federal Rule of Civil Procedure 56. For the reasons explained herein, Defendants' motion is <u>GRANTED</u>.

## **Factual Background**

On May 10, 2012, Plaintiff James Hendrick was enrolled in the Clark County Drug Treatment Court Program ("DTC Program") after pleading guilty to possession of marijuana and admitting to having violated his probation.

Upon entering the program, Hendrick signed a Drug Court Agreement, which explained that, in exchange for agreeing to enter the DTC Program, the Clark Circuit Court would defer entering a judgment of conviction against him and would instead subject him to the conditions established by the DTC Program. Hendrick Dep. Ex. 7 at ¶ 1. If Hendrick successfully completed the DTC Program, the State would move to

1

dismiss with prejudice the charges to which he had pled guilty. *Id.* If, however, the court determined that Hendrick had violated any of the conditions of the Drug Court Agreement, his participation in the DTC Program would be terminated (following a "due process hearing on Petition to Terminate"), a judgment of conviction would be entered against him, and he would be sentenced pursuant to the plea agreement for his offenses. *Id.* at ¶ 2, 4.

Of particular relevance here is the requirement under the Drug Court Agreement that Hendrick "notify his[] case manager and treatment providers within 24 hours of any change in residence, mailing address, phone number, or employment." *Id.* at ¶ 21. He was also notified that a "[f]ailure to meet with Staff as directed," or any other "non-compliance with Drug Court requirements defined in this Agreement … may result in sanctions from the Judge, including short[-]term jail detention for each new incident and the possibility of termination from the Program." *Id.* at ¶ 19.

The Agreement also contained the following release/waiver provision:

> The Defendant releases and forever discharges the complaining witness, victims, judge, prosecutor, defense counsel, police departments, drug court staff, and service providers and their respective heirs, successors and executors from any and all claims of any kind or nature whatsoever, either in law in inequity (sic), arising out of his or her arrest, participation in, or terminations from, the Drug Court Program and does expressly release and forever hold harmless from any criminal or civil action which the Defendant may have a right to bring as a result of the Defendant's arrest or participation in the Drug Treatment Court Program.

*Id.* at ¶ 11.

In September 2013, Hendrick was participating in the DTC Program and residing at "Jerry's Place," a Drug Court-approved halfway house owned and operated by Jerry Westmoreland. During that time, Hendrick was using a prepaid cellular phone, the number for which he had provided to his case manager, Mr. Seybold. However, on Friday, September 20, 2013, when Hendrick was nearing the end of his prepaid minutes on the phone, he purchased a new prepaid phone with a new number. Hendrick gave the new phone number to Jerry Westmoreland, but did not contact his case manager, Mr. Seybold, to provide it to him.

The following day, on September 21, 2013, Hendrick took advantage of a "weekend pass" issued by Westmoreland. According to Hendrick, the pass allowed him to spend the night outside the halfway house. Before departing Jerry's Place for the night, Hendrick left contact information with Westmoreland, including the name, phone number, and address of the friend with whom he would be staying. That evening, the Director of the Drug Court Program, Susan Knoebel, and the Drug Court Bailiff, Jeremy Snelling, conducted home visits and curfew compliance checks of participants of the DTC Program. Following up on reports that, contrary to DTC Program rules, residents of Jerry's Place were being given weekend passes, Knoebel contacted the Jerry's Place house manager, John Doss, who confirmed that approximately five DTC Program participants, including Hendrick, had been issued weekend passes.

Snelling called the phone numbers on file with the DTC for each of the five participants, informing them that the weekend passes issued by Westmoreland were not allowed by the Program and instructing the participants to return to Jerry's Place by the regular 11:00 p.m. curfew. Given that Hendrick's phone number that was on file with the DTC had run out of minutes the day prior, Snelling was unable to reach Hendrick, resulting in several voices messages being left for him.

Later that evening, Knoebel and Snelling travelled to Jerry's Place to confirm that the participants whom Snelling had been able to reach had returned to the halfway house by the 11:00 p.m. curfew. While at the residence, they spoke with Doss and Westmoreland concerning Hendrick's whereabouts. The parties dispute whether Doss and Westmoreland provided Knoebel and Snelling with Hendrick's new phone number as well as the number and address of the friend with whom Hendrick was staying that night; however, it is undisputed that no attempts were made to reach Hendrick at either of those numbers that evening. Knoebel logged her attempts to reach Hendrick into the court's case management system, and she and Snelling returned to the courthouse to complete their duties for the night.

The next morning, upon discovering that Knoebel and Snelling had been looking for him, Hendrick called the DTC emergency hotline and left a message stating that though he had been away on a weekend pass, he had now returned to Jerry's Place. Iris Rubadue, another member of the DTC staff, returned Hendrick's call and left a message stating that they knew he was away on a weekend pass, that "everything was fine," and

that he could call back if he had any questions. Hendrick attempted to call back, but his call went unanswered.

On Monday morning, after having been notified of Hendrick's calls to the hotline, Knoebel told Hendrick's case manager, Mr. Seybold, to contact Hendrick and inform him that he needed to report to the DTC Office immediately. At approximately 10:40 a.m., Seybold reached Hendrick by phone at Hendrick's place of employment, Rocky's Sub Pub, and informed him that he must report to the DTC Office "as soon as possible." Hendrick understood the instruction to mean that he should report to the DTC Office immediately after his shift at Rocky's ended. Thus, as of 1:30 p.m. that afternoon, Hendrick had still not reported to the office, prompting Knoebel to inform the supervising judge of the Drug Treatment Court, Clark Circuit Judge Jerome F. Jacobi, that Hendrick had not been located at Jerry's Place on Saturday night and that he had not promptly reported to the office on Monday morning.

Shortly thereafter, Judge Jacobi conducted a warrant hearing on the record, during which Knoebel testified regarding her efforts to locate Hendrick on Saturday, his phone calls on Sunday, and his instructions to report on Monday. Judge Jacobi also spoke by phone with Jerry Westmoreland, who reported that Hendrick had returned to Jerry's Place on Sunday evening and that he (Westmoreland) had instructed Hendrick to report to the DTC Office first thing Monday morning. Judge Jacobi indicated on the record that a warrant would issue for Hendrick's arrest.

According to Defendants, an off-the-record conversation occurred following the hearing, during which Judge Jacobi instructed Snelling and Knoebel to "locate" Hendrick and take him to the Clark County Jail. Although neither Knoebel nor Snelling possessed the legal power to make an arrest beyond the courthouse premises, they drove to Hendrick's place of employment, handcuffed Hendrick behind his back, escorted Hendrick out of the restaurant and into a county-owned car, and transported Hendrick to the Clark County Jail, where he was held for three days until he appeared at a hearing on Thursday September 26, 2013, and for an additional thirty days thereafter, until October 25, 2013.[1]

On April 15, 2015, Hendrick filed this lawsuit against Defendants Clark County, Clark County Sheriff, John and Jane Does 1–5, Susan Knoebel, and Jeremy Snelling. Dkt. 1. Hendrick alleged in his Complaint that Knoebel and Snelling committed an unreasonable seizure and unlawful arrest in violation of Fourth Amendment (Counts I & II) and unlawfully deprived him of his liberty in violation of the Fourteenth Amendment's Due Process Clause (Count III). He also alleged that Clark County and the Clark County Sheriff were liable for these constitutional violations under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) (Count IV). In addition, Hendrick raised claims

---

[1] Defendants maintain that they offered Hendrick the option of declining to return with them, in which case they would contact local law enforcement officers to arrest him and take him to jail. Plaintiff disputes this account and maintains that when Knoebel and Snelling arrived, they simply asked him to place his hands behind his back and proceeded to escort him to their vehicle without ever offering him the alternative of being arrested by the Jeffersonville Police.

against Knoebel, Snelling, and Clark County for battery, false imprisonment, false arrest, and negligence in violation of Indiana law (Counts V–VIII).

On September 16, 2016, Defendants filed motions for summary judgment on Plaintiff's claims. Dkts. 35, 37. In responding to Defendants' motions, Plaintiff abandoned his Fourteenth Amendment claims against Knoebel and Snelling (Count III), his *Monell* claims against Clark County and Clark County Sheriff (Count IV), and all of his state law claims (Counts V–VIII). See Dkt. 45 at 2. We, therefore, <u>GRANT</u> Defendants' Motion [Docket No. 35] with regard to those claims.[2] What remains are Hendrick's Fourth Amendment claims against Defendants Knoebel and Snelling (Counts I & II). Defendants' motion for summary judgment became fully briefed on November 30, 2016 and is now ripe for decision.

## Legal Standard

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

---

[2] The parties have stipulated to a partial dismissal of Defendants Clark County, Clark County Sheriff, John and Jane Does 1–5 [dkt. 49], which we approved on February 21, 2017 [dkt. 50], rendering Defendants' Motion for Summary Judgment with regard to Defendants Clark County, Clark County Sheriff, and John and Jane Does 1–5 [dkt. 37] <u>MOOT</u>.

moving party is entitled to a judgment as a matter of law." *Hemsworth v.*

*Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for

summary judgment, the court reviews "the record in the light most favorable to the non-

moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v.*

*DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted).

"However, inferences that are supported by only speculation or conjecture will not

defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th

Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the

burden of proof on a particular issue may not rest on its pleadings, but must affirmatively

demonstrate, by specific factual allegations, that there is a genuine issue of material fact

that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party

cannot meet this burden with conclusory statements or speculation but only with

appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F.

Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of

evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper

trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir.

2001) (citations and quotation marks omitted). "[N]either the mere existence of some

alleged factual dispute between the parties nor the existence of some metaphysical doubt

as to the material facts is sufficient to defeat a motion for summary judgment."

*Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

## Discussion

Defendants Knoebel and Snelling raise two challenges to Plaintiff's Fourth Amendment claims against them. First, they contend that his claims are barred by a release provision contained in the DTC Agreement signed by Hendrick upon his entry into the DTC Program. Second, they contend that, even if the release did not bar Hendrick's claims against them, they are nonetheless entitled to immunity from suit. Because we find that Defendants are entitled to immunity from suit on Plaintiff's Fourth Amendment claims, we begin and end our analysis with that argument. [3]

---

[3] Though we need not rule on Defendants' argument concerning the waiver provision in the DTC Agreement, we note our serious doubts as to its enforceability under Indiana contract law, given the conspicuous lack of parity between the parties, the absence of specificity in the provision's language, the fact that it purports to absolve the DTC's employees of liability for intentionally tortious conduct, and the fact that the DTC Program is an entity of the local government performing a public service. *See generally LaFrenz v. Lake Cty. Fair Bd.*, 360 N.E.2d 605, 608 (Ind. Ct. App. 1977). Moreover, because the provision implicates federal common law by purporting to waive federal statutory and constitutional rights, the likelihood of its enforceability is increasingly remote. Federal courts are rightly skeptical, albeit not uniformly dismissive, of claims that a plaintiff has waived his constitutional rights or has released a defendant from liability for violating them. We "indulge every reasonable presumption against waiver of fundamental constitutional rights," *Johnson v. Zerbst,* 304 U.S. 458, 464 (1938); *Bayo v. Napolitano,* 593 F.3d 495, 503 (7th Cir. 2010), and we acquiesce in a waiver only if it has been "knowing, intelligent, and voluntary." *Schriro v. Landrigan,* 550 U.S. 465, 484 (2007). The lack of specific language in the agreement before us, in conjunction with its prospectivity, not only falls short of eliciting "an intentional relinquishment or abandonment of a known right or privilege," *Patterson v. Illinois,* 487 U.S. 285, 292–93 (1988), but also encourages DTC staffers to violate the DTC participants' constitutional rights, knowing they are acting with impunity. Enforcing such an agreement is inconsistent with the public interest given its potential for abuse and cancellation of the participants' primary means of vindication.

We begin our analysis with a discussion of the parameters of Plaintiff's Fourth Amendment claims. As noted previously, Plaintiff has abandoned his Fourteenth Amendment due process claims against Knoebel and Snelling (Count III) as well as his *Monell* claims against Clark County and Clark County Sheriff (Count IV) in response to Defendants' motions for summary judgment, leaving only his Fourth Amendment claims against Knoebel and Snelling (Counts I & II) for review.

Count I of Plaintiff's Complaint, ("Violation of the Fourth Amendment – Unreasonable Seizure Brought Pursuant to 42 U.S.C. § 1983, Against Knoebel and Snelling"), contains the following allegations:

> 38. At all times relevant to this action, Knoebel and Snelling had no powers of arrest, and were not deputized or sworn law enforcement officers.
>
> 39. Under the circumstances described herein, on September 23, 2014, Knoebel and Snelling had a duty to not unreasonably or illegally seize Hendrick.
>
> 40. In committing the acts described in the preceding paragraphs, Knoebel and Snelling committed an unreasonable and illegal seizure during their encounter with Hendrick.

Dkt. 1 at ¶¶ 38–40 (emphasis added).

Count II of the Complaint, ("Violation of the Fourth Amendment – Unlawful Arrest Brought Pursuant to 42 U.S.C. § 1983, Against Knoebel and Snelling"), contains similar allegations:

> 48. Under the circumstances described herein, Knoebel and Snelling had a duty to not unlawfully arrest Hendrick.

49. In committing the acts described in the preceding paragraphs, Knoebel and Snelling exceeded the limits of an investigatory stop made pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968).

50. Instead, in committing the highly intrusive actions described herein, including, but not limited to, <u>the handcuffing</u> and <u>the lengthy detention</u> of Hendrick, the actions of Knoebel and Snelling rose to the level of an arrest of Hendrick, for which probable cause did not exist, and only a wrongfully-obtained warrant existed, and which was therefore unlawful.

*Id.* at ¶¶ 48–50 (emphasis added).

Plaintiff's allegations contained in Counts I & II fail to identify the specific conduct or actions allegedly committed by Defendants Knoebel and Snelling that Plaintiff believes violated his Fourth Amendment protections against unreasonable seizures. Plaintiff's responsive briefing is equally vague, including only a general reference to "the disputed and uncontested facts of this encounter" as "mak[ing] out deprivations of Hendrick's right under the Fourth Amendment, including, in particular his right not to be wrongfully seized or falsely arrested." Pl.'s Resp. at 18.

We highlight this ambiguity in light of Defendants' argument that they are entitled to judicial or quasi-judicial immunity for their roles in the issuance of the arrest warrant. It is true that a Fourth Amendment suit can be brought against an officer who knowingly or intentionally submits an arrest warrant application containing a false statement or material omission, *see Franks v. Delaware*, 438 U.S. 154, 155–56 (1978), but we do not

interpret Counts I & II of Plaintiff's Complaint to embrace such a claim.[4] We interpret Plaintiff's claim against Defendant Snelling as a violation of his Fourth Amendment rights when he effectuated an arrest without legal authority to do so and without probable cause. Plaintiff's claim against Defendant Knoebel is based on her failure to intervene to prevent this unconstitutional arrest.

According to Plaintiff's testimony, shortly after 2:00 p.m. on Monday, September 23, 2013, Defendants Susan Knoebel and Jeremy Snelling arrived at Rocky's Sub Pub Restaurant, in New Albany, Indiana. They entered through the front door of the restaurant and proceeded directly towards him. Recognizing Snelling as the DTC bailiff, Hendrick greeted him, saying "Hey, Jeremy." Hendrick Decl. at ¶ 10. Snelling allegedly responded with, "Hi Coty. Can you put your hands behind your back for me?" *Id.* Complying with Snelling's directive, Hendrick placed his arms behind his back, and he was handcuffed, escorted to and placed in the back seat of the Defendants' county-owned vehicle, and driven to the Clark County Jail. *Id.*

Defendants do not dispute this account for purposes of this motion and concede Snelling's actions constituted an arrest or seizure under the Fourth Amendment. *See United States v. Mendenhall*, 446 U.S. 544, 554 (1980) ("[A] person has been 'seized' within the meaning of the Fourth Amendment ... if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to

---

[4] Indeed, Plaintiff does not cite to *Franks* or its progeny in his briefing, opting instead to focus on Defendants' post-hearing conduct.

leave."); *e.g., Brokaw v. Mercer Cty.*, 235 F.3d 1000, 1010 (7th Cir. 2000) (holding that a Fourth Amendment 'seizure' occurred where a plaintiff was "physically carried out of his home, placed in a car, and driven away from his family."). Defendants also concede that, as a courtroom bailiff and DTC employee, Jeremy Snelling's powers of arrest were limited to the Clark County Courthouse. Defendants argue, however, that they are entitled to summary judgment because their actions were protected by both absolute and qualified immunity.

### I. Absolute Immunity

Citing the Seventh Circuit's decision in *Henry v. Farmer City State Bank*, 808 F.2d 1228 (7th Cir. 1986), Defendants contend that their actions were cloaked in absolute quasi-judicial immunity because they were undertaken in response to a directive from Judge Jacobi.

In *Henry,* the Seventh Circuit held that "police officers, sheriffs, and other court officers who act in reliance on a facially valid court order are entitled to quasi-judicial immunity from suit under § 1983 for damages." *Id.* at 1239. The *Henry* court reasoned that the true source of the plaintiff's injury in such situations is not the officials' performance of the "ministerial act" of enforcement, but rather is the judge's order itself, and a suit against the enforcing officers is an inappropriate vehicle for challenging the validity of a court's order. *Id.*

Here, Defendants maintain that following the *ex parte* hearing concerning Hendrick's DTC rules violations, both Snelling and Knoebel walked with Judge Jacobi

13

from the courtroom to his chambers and that at some point along the way, Judge Jacobi

instructed them to locate Hendrick and take him to the Clark County Jail. Knoebel Decl.

at ¶ 23; Snelling Decl. at ¶ 15. Based on their prior experience, Knoebel and Snelling

understood Judge Jacobi's instruction to be that they should locate Hendrick and give

him the option of being escorted by them to jail or, alternatively, to be arrested by local

law enforcement officers.[5] *Id.* Defendant Snelling maintains that he did just that: he

located Hendrick at Rocky's Sub Pub and gave him the option of being escorted to jail or

waiting to be arrested by the Jeffersonville Police. Snelling Decl. at ¶ 18. Snelling further

alleges that Hendrick responded, saying he did not want to be arrested by the

Jeffersonville Police and, without further prompting, Hendrick voluntarily turned around

and placed his hands behind his back. *Id.* Acting "[p]ursuant to procedures applicable to

probation officers," Snelling placed Hendrick in handcuffs and escorted him in the

county-owned vehicle to the Clark County Jail. *Id.* at ¶ 15.[6]  According to Defendants, all

of these actions taken by them were pursuant to Judge Jacobi's "explicit instruction" and

therefore are protected by quasi-judicial immunity under the Seventh Circuit's holding in

*Henry*, 808 F.2d 1228. See Defs.' Mem. at 28.

---

[5] Not surprisingly, Knoebel and Snelling both recount that every DTC participant to whom they ever presented this ultimatum opted to be "escorted" by the DTC staff as opposed to waiting for local police officers to effect their arrest.

[6] Knoebel maintains that she was not present for this exchange since she went immediately to locate the restaurant manager to inform him of Hendrick's situation. She states that Hendrick was already in handcuffs by the time she finished speaking with the manager. Knoebel Decl. at ¶ 26.

We note at the outset that the Seventh Circuit has expressly limited the application of *Henry* quasi-judicial immunity to the enforcement of <u>valid</u> court orders. *See Zoretic v. Darge*, 832 F.3d 639, 644 (7th Cir. 2016), *reh'g denied* (Sept. 2, 2016) ("where officers are not acting pursuant to an enforceable order, they cannot receive quasi-judicial immunity.") *citing Dunn v. City of Elgin*, 347 F.3d 641 (7th Cir. 2003). This does not require officers to undertake a legal analysis of a court's order prior to enforcing it, but it does required that, at a minimum, they "look for some indicia of authority…before enforcing an order." *Dunn*, 347 F.3d at 648. "The officers' failure to perform even this minimal step to ensure that they had judicial authority [] means that they cannot [later] claim quasi-judicial immunity." *Id.*

We know of no authority permitting Defendants to rely on Judge Jacobi's instructions, which were purportedly issued orally and informally while the three of them walked down the hallway of the courthouse. Such an order does not bear the indicia of being a valid and enforceable order capable of conferring absolute immunity. Indeed, the Seventh Circuit recently made clear it has "never" held that informal or indirect instructions from a court to an officer confers such immunity. *Schneider v. Cty. of Will, Ill.*, 528 F. App'x 590, 593 (7th Cir. 2013) (collecting cases). This limitation makes sense in light of the primary purpose of quasi-judicial immunity, namely, to encourage claimants to challenge court orders directly on appeal as opposed to waging collateral attacks through suits against the enforcing officers. This goal cannot be achieved with regard to off-the-record instructions orally delivered in the back hallways of the

courthouse. *See Richman v. Sheahan,* 270 F.3d 430, 437 (7th Cir. 2001) ("extension of absolute immunity [to law enforcement officers] is not primarily to protect the enforcement function performed by the deputies, but rather to protect the judicial decision-making function by discouraging collateral attacks and encouraging appeals.").

Notwithstanding the suspect nature of Judge Jacobi's "order," Plaintiff has raised no objection to its enforceability. Instead, Plaintiff's challenge to Defendants' claim of quasi-judicial immunity is based on Defendants' failure to strictly follow Judge Jacobi's instructions. Hendrick maintains that neither Snelling nor Knoebel ever offered him the option of declining their invitation to be "escorted" to jail, thereby ensuring his arrest by the Jeffersonville Police Officers. Plaintiff's complaint, therefore, is not with Judge Jacobi's "order" at all; it is over the manner in which that order was enforced. As such, Plaintiff's challenge invokes a second, separate limitation under the *Henry*-based quasi-judicial immunity. As the Seventh Circuit has explained:

> [F]or court personnel and adjuncts who do not exercise a discretionary function comparable to a judge's, the justification for extending absolute immunity is most compelling when the lawsuit challenges conduct specifically directed by the judge, and not simply the manner in which the judge's directive was carried out.
>
> …
>
> The policies articulated in our quasi-judicial immunity cases have less force when, as in this case, the challenged conduct is the manner in which the judge's order is carried out, and not conduct specifically directed by a judge.
>
> …

> The claim for damages in [such a] case is not therefore a collateral attack on the judge's order…and an appeal of the judge's order would provide no remedy. Similarly, the [Defendants] are not being called upon to answer for wrongdoing directed by the judge, but instead for their own conduct. And that conduct—the manner in which they enforced the judge's order—implicates an executive, not judicial, function.

*Richman*, 270 F.3d at 437–38.

Thus, Plaintiff's challenge to Defendants' claim of quasi-judicial immunity turns on a question of fact: in arresting Hendrick, did Defendants abide by Judge Jacobi's instructions? While the parties do not dispute those instructions or Defendants' understanding of them, they do maintain contradictory accounts of their "encounter" at Rocky's Sub Pub. Their disagreement creates a material dispute of fact which precludes summary judgment on the issue of quasi-judicial immunity. A jury would need to resolve this factual issue before a determination of absolute immunity could be made.

## II. Qualified Immunity

Even in the absence of absolute immunity, government officials are entitled to immunity from suit in the form of qualified immunity for conduct performed by them which comes within the scope of their official duties. *Richman*, 270 F.3d at 434 ("The ordinary rule is that qualified—and not absolute—immunity is sufficient to protect law enforcement officers in the conduct of their official duties.").

The distinction between absolute and qualified immunity is that the former shields from liability even knowingly unlawful or plainly incompetent acts, whereas the latter covers only "conduct that 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Bianchi v. McQueen*, 818 F.3d 309, 316–17 (7th Cir. 2016) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). Courts face two primary questions when a defendant invokes the defense of qualified immunity: (1) did the plaintiff suffer a deprivation of a constitutional right, and (2) was that right clearly established at the time and under the circumstances presented by the case at hand? *Id.* If the answer to either questions is no, Defendants are entitled to qualified immunity and summary judgment must enter in their favor. District courts are authorized to determine the order in which they resolve these questions; in some cases, it may be prudent to determine whether the constitutional right was clearly established at the time of the officers' conduct before plowing new ground by addressing a previously unsettled constitutional issue. *Pearson v. Callahan*, 555 U.S. 223, 236–242 (2009). Such is the case here.

Plaintiff alleges that Defendants Knoebel's and Snelling's actions violated his Fourth Amendment rights. Pls.' Resp. at 18. The Fourth Amendment, as incorporated by the Fourteenth Amendment, provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated,…" U.S. Const., amend. IV. Whether an arresting officer's conduct violated the Fourth Amendment as an unlawful search or seizure turns on whether the search or

seizure was reasonable. *Dunn v. City of Elgin, Ill.*, 347 F.3d 641, 648 (7th Cir. 2003).

Defendants concede for purposes of this motion that Snelling's conduct effected a seizure

of Hendrick, *see Brokaw, supra.* However, because it was not clearly established as of

September 2013 that this seizure of Hendrick was or would be deemed a constitutionally

unreasonable act, they are entitled to qualified immunity protection.

Once a defense of qualified immunity is raised, the burden falls on Plaintiff to

establish that his rights were, in fact, clearly established at the time he was arrested. To

carry this burden, he must "show either a reasonably analogous case that has both

articulated the right at issue and applied it to a factual circumstance similar to the one at

hand or that the violation was so obvious that a reasonable person necessarily would have

recognized it as a violation of the law." *Canen v. Chapman*, 847 F.3d 407, 412 (7th Cir.

2017) (quoting *Chan v. Wodnicki*, 123 F.3d 1005, 1008 (7th Cir. 1997)).

Hendrick's efforts and arguments fall well short of this mark. Initially, he argues

that "[t]he right to be free from false arrest was well-established in 2013," citing a

number of Supreme Court and Seventh Circuit cases in support of this broad and largely

uncontroverted proposition. See Pl.'s Resp. at 18. However, the Supreme Court has

repeatedly stressed that for purposes of qualified immunity, the right at issue must be

articulated at a meaningful level of particularity. *White v. Pauly*, —— U.S. ——, 137 S.Ct.

548, 551–52 (2017) (collecting cases). Hendrick's showing must extend beyond the

invocation of a general constitutional right, and show that, properly narrowed and

articulated, it was a clearly established right at the time of his arrest. *See Anderson v.*

*Creighton*, 483 U.S. 635, 639–40 (1987). While he need not necessarily point to a decision that is "on all fours" with the facts and issues presented here, there must be some settled legal authority that would inform Defendants regarding the illegality of their actions. *See Mullenix v. Luna*, ⸻ U.S. ⸻, 136 S.Ct. 305, 308 (2015).

Plaintiff has sidestepped any such controlling legal authorities, attempting instead to distinguish the case on which Defendants have relied to establish that their seizure of him was constitutional.

Defendants cite to the holding in *Pasiewicz v. Lake Cty. Forest Pres. Dist.*, 270 F.3d 520, 526 (7th Cir. 2001) as support for the constitutionality of the seizure of Hendrick, even if it occurred without any legal authority. In *Pasiewicz* the Seventh Circuit ruled that a forest preserve police officer who made an arrest based on probable cause did not act unreasonably or in violation of the Fourth Amendment simply because the arrest was made outside the forest territory and may have exceeded his jurisdiction under state law. 270 F.3d at 527 ("the officers did not act unreasonably under the Fourth Amendment, even assuming that they acted outside their jurisdiction."). Similar to the forest preserve officer in *Pasiewicz,* Defendants maintain that Snelling's arrest of Hendrick may have exceeded his state-granted territorial jurisdiction, which, as a bailiff, was limited to the courtroom, but that his actions did not violate the Fourth Amendment because they were not otherwise unreasonable.

We incorporate Plaintiff's response to this argument, in its entirety, as follows:

Defendants rely upon *Pasiewicz v. Lake Cty. Forest Pres. Dist.*, 270 F.3d 520, 526 (7th Cir. 2001), for the proposition that an arrest by officers outside their jurisdiction does not per se amount to a violation of the federal Constitution. (Dkt.36, p.29) But *Pasiewicz* was subsequently limited by *Dunn v. City of Elgin, Ill.*, 347 F.3d 541 (7th Cir. 2003), which noted that it was unclear whether a statutory violation even occurred, because the park ranger defendants therein had authority to make arrests "in aid of the regular police force." *Dunn*, 347 F.3d at 649. *Dunn* also noted that, even if the park rangers had no authority, the factual context of the seizure is more important. *Dunn*, 347 F.3d at 649. "Different factual scenarios will weigh differently 'on the scales of reasonableness.'" *Id.*

Here, on the facts most favorable to the Plaintiff, Defendants acted unreasonably by violating the understanding and instructions of Judge Jacobi—and not just the fact they were operating beyond their authority. They refused to accept contact information from Westmoreland and Doss; they failed to call Hendrick in on the hotline message on Monday morning; were clearly aggravated by their (mis)perceptions of Hendrick's behavior; and Knoebel failed to inform the Court of the foregoing when seeking a warrant. Perhaps in part due to their frustrations, they acted unreasonably when they seized and arrested Hendrick. *See also Malone v. County of Suffolk*, 968 F.2d 1480 (2nd Cir. 1992) (whether having valid authority to arrest pursuant to state law affects the constitutionality of the arrest); *Ross v. Neff*, 905 F.2d 1349 (10th Cir. 1990) (warrantless arrest executed outside of the arresting officer's jurisdiction is analogous to a warrantless arrest without 'probable cause' which is 'presumptively unreasonable'); and *United States v. Foster*, 566 F. Supp. 1403 (D.D.C. 1983) ("[t]he concept of reasonableness embodied in the Fourth Amendment logically presupposes an exercise of lawful authority by a police officer. When a law enforcement officer acts beyond his or her jurisdiction, the resulting deprivation of liberty is just as unreasonable as an arrest without probable cause").

Pl.'s Resp. at 20.

Plaintiff's response consists of a hodge-podge of factual "what ifs" and a confusing legal analysis. To the extent Plaintiff interprets the holding in *Pasiewicz* to turn on whether the officer in question might arguably have had authority under state law to make the arrest at issue, we do not read it thus. *Pasiewicz* has consistently been interpreted for the holding that, even when an officer acts outside of his legal authority, his action is not necessarily unreasonable under the Fourth Amendment. *See Dunn*, 347 F.3d at 649. Even so, we agree with Plaintiff that the Seventh Circuit distinguished its holding in *Pasiewicz* in *Dunn v. City of Elgin, Ill.*, 347 F.3d 641, 648–49 (7th Cir. 2003), which we explain hereafter.

In *Dunn*, the Seventh Circuit held that it was objectively unreasonable for Illinois police officers to seize a fifteen-month-old child in Illinois based on a North Carolina custody order, where the officers who had been dispatched by their superior acknowledged that they did not have authority to enforce the order, given that they were authorized only to perform "peacekeeping standby service." 347 F.3d at 648. In distinguishing *Pasiewicz*, the Seventh Circuit noted that the officers' enforcement of an out-of-state order implicated federalism in ways that the *Pasiewicz* case did not. More importantly, the seizure in *Dunn* involved taking the infant based solely on an unenforceable out-of-state order which contravened the "peacekeeping" instructions they had received, whereas "the officers [in *Pasiewicz*] arrested an adult on a public indecency

charge, knowing that any restraint was likely to be short and that the seized person would have the chance to defend himself in court." Dunn, 347 F.3d at 649.

While the results of the *Pasiewicz* and *Dunn* analyses diverge, the reasoning underlying those decisions aligns nicely. In *Pasiewicz*, the Seventh Circuit made clear that, under the Fourth Amendment, the overall objective reasonableness of the arresting officer's conduct must be analyzed, given that "an officer can act incorrectly with regard to his jurisdiction just as he can act incorrectly with regard to any other factor involved in the exercise of his authority." 270 F.3d at 527. The factual context of the seizure, including the fact that the officer was acting outside of his jurisdiction, must be taken into account in its entirety when determining the reasonableness of the officers' conduct.

Nevertheless, Plaintiff's briefing problem remains: he has failed to identify any "reasonably analogous case that has both articulated the right at issue and applied it to a factual circumstance similar to the one at hand or [to show] that the violation was so obvious that a reasonable person necessarily would have recognized it as a violation of the law." *Canen v. Chapman*, 847 F.3d 407, 412 (7th Cir. 2017). Indeed, even in *Dunn,* where the Seventh Circuit found the officers' conduct to be objectively unreasonable, the officers were nonetheless entitled to qualified immunity because the plaintiff failed to point to a case where the enforcement of an out-of-state custody order that occurred in

violation of a state statute amounted to a constitutional violation. *Dunn*, 347 F.3d at 650–51.[7]

Because Plaintiff has been unable to show that as of September 2013 it was clearly established that an extraterritorial seizure conducted by a bailiff following the court's issuance of an arrest warrant could violate the Fourth Amendment, Defendants Snelling and Knoebel are entitled to qualified immunity on that claim against them.

We pause to note that our ruling should not be construed as support for the constitutionality of Snelling's and Knoebel's conduct under the Fourth Amendment; that presents a much closer and more difficult issue. Particularly troubling is the fact that both Snelling and Knoebel admit that they knew they lacked the power to arrest DTC participants in the community, yet, notwithstanding that knowledge, they proceeded to place Hendrick in handcuffs and take him into custody based solely on the out-of-court instructions of Judge Jacobi. The Seventh Circuit stated in *Pasiewicz* that the "case *might arguably be viewed differently* if [the defendants] knew they lacked jurisdiction…Such a blatant disregard of state law and the chain of command *could* weigh on the scales of reasonableness." 270 F.3d 527. Whether Defendants' knowledge that they lacked the legal power to make the arrest of Hendrick would tip the scales of reasonableness in his favor, we cannot say; we can only hold, as we have, that these facts fall short of "clearly

---

[7] The string citation included at the end Plaintiff's argument does little to strengthen his case, particularly in light of the Seventh Circuit's explicit reference in both *Pasiewciz* and *Dunn* to the circuit split that has been created by these holdings. *See Pasiewicz*, 270 F.3d at 526 n.3; *Dunn*, 347 F.3d 650–51.

establishing" that their conduct was violative of Hendrick's Fourth Amendment rights. "For a right to be clearly established for purposes of qualified immunity, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Canen*, 847 F.3d at 412 (citing *Reichle v. Howards*, 566 U.S. 658 (2012)). Without Plaintiff's citation to any existing precedent which places beyond debate the questions presented by this case, we are relieved of the obligation to engage in an "essentially academic exercise" focusing on whether Defendants' reliance on Judge Jacobi's instructions and the court-issued arrest warrant outweighed their knowledge that Snelling's arrest powers were limited to the courtroom so as to render his conduct (and Knoebel's failure to intervene) objectively unreasonable, in violation of the Fourth Amendment. *Pearson*, 555 U.S. at 237. Our ruling here is limited to the immunity issues. Fourth Amendment claims almost always are fact dependent. Because Defendants' factual assertions regarding the scope of Snelling's arrest jurisdiction and Snelling's and Knoebel's action in serving the court-issued arrest warrant when they seized Hendrick were neither challenged nor otherwise addressed by Plaintiff, we regarded them as undisputed facts for the purposes of ruling on the pending motion. See Fed. R. Civ. P. 56(e)(2).

## Conclusion

For the foregoing reasons, Defendants Jeremy Snelling and Susan Knoebel are entitled to qualified immunity on Plaintiff's claims against them under the Fourth Amendment. Accordingly, we <u>GRANT</u> Defendants' Motion for Summary Judgment

[Docket No. 35] as to Counts I and II of Plaintiff's Complaint. All claims have now been resolved, final Judgment shall enter accordingly.

IT IS SO ORDERED.

Date: 5/10/2017

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

R. Jeffrey Lowe
KIGHTLINGER & GRAY, LLP-New Albany
jlowe@k-glaw.com

Mark W. Sniderman
SNIDERMAN NGUYEN LLP
mark@snlawyers.com

James S. Stephenson
STEPHENSON MOROW & SEMLER
jstephenson@stephlaw.com

Rosemary L. Borek
STEPHENSON MOROW & SEMLER
rborek@stephlaw.com